UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRUCE A. ZERINGUE                          CIVIL ACTION

VERSUS                                     NUMBER: 09-5935

MICHAEL J. ASTRUE,                         SECTION: "I"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 10, 16).

Bruce A. Zeringue, plaintiff herein, filed the subject application for DIB on July 19, 2007 alleging disability as of October 28, 2005. (Tr. pp. 73-77). In a Disability Report that appears in the record back and neck problems were identified as the conditions resulting in plaintiff's inability to work. (Tr. pp. 89-

97). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on August 10, 2007. (Tr. pp. 42-45). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on January 27, 2009 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 46, 18-40). On February 20, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 7-17). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

> I.  [t]he ALJ failed to give controlling weight to plaintiff's treating physician.
>
> II. [t]he ALJ's decision is not based on substantial evidence.

(Rec. doc. 10-1, pp. 9-10).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.  [t]he claimant meets the insured status requirements of

2

the Social Security Act through December 31, 2011.

2.    [t]he claimant has not engaged in substantial gainful
      activity since June 1, 2007, the alleged onset date (20
      CFR 404.1571 et seq.).

3.    [t]he claimant has the following severe impairments:
      status post cervical fusion and status post lumber [sic]
      spine fusion (20 CFR 404.1521 et seq.).

4.    [t]he claimant does not have an impairment or combination
      of impairments that meets or medically equals one of the
      listed impairments in 20 CFR Part 404, Subpart P,
      Appendix 1 (20 CFR 404.1525 and 404.1526).

5.    [a]fter careful consideration of the entire record, the
      undersigned finds that the claimant has the residual
      functional capacity to perform light work as defined in
      20  CFR  404.1567(b)  except  [that  he]  has  slight
      limitations in maintaining attention and concentration
      for  extended  period[s]  and  slight  limitation[s]  in
      completing tasks in a normal work day.  This residual
      functional  capacity  is  consistent  with  the  record
      evidence.

6.    [t]he claimant is capable of performing past relevant
      work as a dental lab technician.  This work does not
      require  the  performance  of  work-related  activities
      precluded by the claimant's residual functional capacity
      (20 CFR 404.1565).

7.    [t]he claimant has not been under a disability, as
      defined in the Social Security Act, from June 1, 2007
      through the date of this decision (20 CFR 404.1520(f)).

                              (Tr. pp. 12, 13, 17).

Judicial review of the Commissioner's decision to deny DIB is

limited under 42 U.S.C. §405(g) to two inquiries: (1) whether

substantial  evidence  of  record  supports  the  Commissioner's

decision, and (2) whether the decision comports with relevant legal

standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1983).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1985).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

4

which... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5,

107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of the claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

At the time of the administrative hearing that was held on January 27, 2009, plaintiff was sixty years of age, had an associate's degree in mechanical science, and had past relevant work experience as a dental lab technician. Plaintiff testified that he became involved in that line of work after falling down the stairs which resulted in injuries, surgery, and additional complications. Because he was unable to work as a result of that accident plaintiff had collected Social Security benefits for a closed period of two years. After obtaining training in his new

field, plaintiff opened Central Lafourche Dental Lab with his wife which they successfully ran until he was involved in an automobile accident in October of 2005.

Following the motor vehicle accident, plaintiff was evaluated at the emergency room and was released. He subsequently consulted with a gastroenterologist and was placed on medication and bedrest for a week while his wife and children continued to run the business. Plaintiff testified that as a result of this accident he was no longer able to work in the sitting position he was accustomed to without experiencing significant pain to his neck and arms. He therefore tried to manipulate the height of the sitting position but found that he could only work for thirty to forty-five minutes at a time before needing to rest. In terms of his daily activities at the time of the hearing, plaintiff testified that he could use a computer and that he watched his fourteen month-old granddaughter during the day so that his daughter could work in the family's business. Recently, plaintiff had sustained a minor injury while tightening a clamp on the bilge pump of his pleasure boat.

Upon being questioned by his attorney, plaintiff testified that he drew a salary from his family's business until June/July of 2006 at which time his wife and children assumed the day-to-day operations. Although he could still use a computer, after forty-five minutes everything would tighten up and plaintiff would have

to retire to a recliner and apply heat or cold to the affected area. Plaintiff also testified to suffering from cardiac problems in 1999 with stents being put in place following an angiogram. He occasionally became short-winded on walking in addition to experiencing occasional chest pains even at rest and was generally less active than he was before his cardiac difficulties. Plaintiff testified that he additionally suffered from diabetes and hypertension and took medication consisting of sixteen pills per day. The boat repair he had recently attempted was an exception to the norm as he otherwise did not work on his boat. Plaintiff would occasionally go fishing for two to three hours at a time but would be sore for a day or two afterwards. In light of the testimony that was adduced, plaintiff's counsel formally amended the disability onset date to June 1, 2007. (Tr. pp. 20-38).

Pat Green, a VE, was next to take the stand. She first testified that plaintiff's past work as a dental lab technician was light, skilled work. The ALJ then asked the VE if plaintiff could perform his past relevant work if he was capable of light or sedentary work to which the VE answered in the affirmative. However, if plaintiff additionally suffered from marked or moderate restrictions in his ability to maintain concentration and attention for extended periods of time and in his ability to complete tasks in a normal workday at a consistent pace, past work could not be

performed.  Slight restrictions in the two areas of non-exertional limitations would not preclude the performance of plaintiff's past work. (Tr. pp. 38-40).

The documentary evidence of record begins with a progress note from Dr. Miguel Melgar dated January 13, 2005 when plaintiff was seen for a routine follow-up visit for status post lumbar fusion six months earlier.  Plaintiff was said to be doing remarkably well with complaints of back and leg pain significantly improved although he did have some post-surgery achy pain to the right buttock which had no effect on his ability to work.  Motor strength was 5/5, a sensory exam was unremarkable, straight leg raising was negative, and there was no sciatica. (Tr. p. 126).  On March 24, 2005, plaintiff was again described as doing remarkably well with his pre-surgery chronic back pain being almost completely gone.  X-rays revealed a solid fusion with hardware in place and Dr. Melgar discharged plaintiff from the clinic in light of the significant improvement that had been achieved. (Tr. p. 127).

On August 16, 2005, plaintiff was seen by Dr. Raoul Rodriguez of the Tulane University Hospital & Clinic ("TUHC") after twisting his ankle during a fishing trip.  X-rays were normal.  The impression was an inversion sprain with a lateral ligament injury on October 11, 2005.  Dr. Rodriguez recommended a com-walker, an Ace bandage, and physical therapy. (Tr. p. 139).  Plaintiff was

next seen by Dr. Michael Marcello of the Family Doctor Clinic of Mathews for follow-up of his ankle injury on October 11, 2005. The assessment on this date was restless leg syndrome, sleep apnea, and left ankle pain. Requip was prescribed. (Tr. p. 179).

Plaintiff returned to TUHC on December 5, 2005 after having been rear-ended while stopped at a red light on October 24, 2005. Following the accident, plaintiff had been seen at an emergency room and released but he was now experiencing severe neck, right shoulder, and lower back pain but mostly flank pain on the left side. On physical examination, motor strength was 5/5 throughout, a sensory exam was normal, range of neck motion was preserved although painful in hyperextension, and the lower back was essentially normal. X-rays of the lumbar spine showed that plaintiff's hardware was in correct alignment with no screw backout or spinal instability. Similar studies of the cervical spine revealed old C5-6 pseudoarthrosis and spurs in front of C4 in what may have been an old anterior chip bone fracture on the body of C2. The diagnosis was a whiplash cervical injury, possible chronic pancreatitis, and rule out an old C2 fracture and C5 pseudoarthrosis. A CT scan and MRI of the cervical spine were to be performed. (Tr. pp. 140-141). On that same date additional x-rays of plaintiff's cervical and lumbar spines were taken at the Lakeview Regional Medical Center. Those studies revealed

degenerative changes of the cervical spine with annular calcification of C4-5 and intervertebral disc space narrowing at C5-6. Views of the lumbar spine showed status post posterior fusion of L2 through L5 with surgical hardware in place, decreased height of the L5 vertebral body, and extensive degenerative changes of the lower lumbosacral spine. (Tr. pp. 174-177).

On December 12, 2005, plaintiff was seen again by Dr. Melgar for complaints of excruciating neck pain after having undergone a CAT scan of the cervical spine as well as an MRI of the neck. The scan showed no signs of fracture but the MRI did reveal significant cervical spondylosis with bilateral foraminal stenosis at C5-6 and C4-5, worse at C4-5, C5-6, and C6-7. On examination, plaintiff had severe neck tenderness and rigid neck spasms. Those symptoms were attributed to the recent automobile accident but plaintiff's lower back, the site of the earlier fusion, continued to improve. The impression was acute cervical pain, cervical spondylosis, and severe foraminal stenosis at C5-6, C6-7, and possibly at C4-5 as well with the compromised nerve roots being at C5 and C6 and possibly C7. The plan was for plaintiff to undergo a standing dynamic MRI, EMG and nerve conduction studies, and a diagnostic block on the C5, C6, and C7 nerves (Tr. pp. 142-143).

The next medical records document plaintiff's cervical myelogram and CT scan on February 1, 2006. The former procedure

showed slight impression upon the anterior aspect of the cervical portion of the thecal sac at C3-4 and C4-5 but evaluation of the C5-6 and C6-7 levels was difficult. The latter test demonstrated degenerative disc and joint disease, worse at the C5-6 level where there were broad-based posterior osteophytes and facet hypertrophy causing bilateral foraminal narrowing of a mild degree with moderate canal narrowing as well. At the C4-5 level there was bulging of the disc along with osteophytic changes causing less significant canal narrowing but still with mild impression upon the anterior aspect of the cord. (Tr. pp. 171-173).

Plaintiff returned to Dr. Marcello on February 22, 2006 for a check-up and to have his medications refilled. Plaintiff was experiencing cervical radiculopathy and neuropathy. The assessment was cervical degenerative joint disease, hypertension, and chronic pain secondary to degenerative joint disease. Plaintiff was prescribed Percocet and was administered an injection of Toradol. (Tr. p. 180).

On March 2, 2006, plaintiff presented himself to Dr. Melgar with complaints of worsening left arm pain running from the shoulder to the elbow and occasionally radiating to the fingers. Right arm pain was different and less frequent. Chiropractic manipulation had produced no significant relief. After being advised of his options plaintiff was admitted to TUHC with an

admission diagnosis of cervical radiculopathy secondary to cervical spondylosis, especially at C4-5. An anterior cervical diskectomy with fusion and plating at C4-5 was then performed by Dr. Melgar which proceeded unremarkably. The day following the surgery plaintiff complained of significant substernal pressure-like pain that resolved on its own in less than an hour. Plaintiff's neck pain improved over the course of his inpatient stay and he was discharged home on the fourth day following surgery with pain medications consisting of MS Contin and Percocet. (Tr. pp. 132-133, 128-129). X-rays that were taken on March 28, 2006 revealed post-surgical changes of the C4-5 vertebral bodies with no evidence of hardware failure. (Tr. pp. 148-149).

Plaintiff underwent a myelogram and CT scan of the cervical spine on April 18, 2006. The radiologist's impression was elevation of the thecal sac at C2-3 and C3-4 without significant spinal stenosis. The CT study demonstrated an early fusion at C4-5 and neural foraminal stenosis at C3-4 and C5-6 but no spinal stenosis. (Tr. pp. 150-155). Plaintiff returned to Dr. Marcello the following day with complaints of right shoulder pain. The diagnosis was cervical disc disease and hypertension. (Tr. p. 181). On May 18, 2006, plaintiff was treated for a cough and congestion. (Tr. p. 182).

The record of the administrative proceedings below contains an

operative report dated June 8, 2006 documenting plaintiff's further surgery of that date at the hands of Dr. Melgar. The procedures that were performed consisted of complete laminactomies at C4, C5, and C6; right microsurgical foraminotomies at C4-5, C5-6 and C6-7; and, C4, C5, C6, and C7 lateral mass fusions with screws and miniplates and C4, C5, and C6 posterolateral fusions with autograft and allograft material. (Tr. pp. 134-136). A CT scan of the cervical spine was done the following day which revealed the surgery and anterior fusions with laminactomies from C4 through C7 and no evidence of hardware failure. (Tr. pp. 157-158). The first day post-operatively plaintiff experienced some pain management issues and was placed on a PCA pump. After his pain was brought under control the PCA pump was discontinued on the second post-operative day and plaintiff was discharged home with various medications and instructions to engage in activity as tolerated but not to lift anything heavier than a gallon of milk while his staples were intact. (Tr. pp. 130-131).

Plaintiff returned to Dr. Marcello on June 23, 2006 with complaints of right ear pain. Percocet and Norflex were prescribed and plaintiff was also administered an injection of Toradol. (Tr. p. 183). On June 29, 2006, plaintiff underwent cardiac-related evaluation by Dr. Rais of the Cardiovascular Institute of the South who noted the stents that had been previously inserted and the

percentages of blockage that remained. (Tr. p. 163). Pursuant to a referral from Dr. Marcello, plaintiff was then evaluated by Dr. Kenneth Wong, a cardiologist, on July 13, 2006. The assessment included hypertensive heart disease and coronary artery disease. (Tr. p. 162).

On September 11, 2006, plaintiff underwent radiographic studies of the cervical spine with flexion and extension. Those x-rays demonstrated stable positioning of the surgical hardware at levels C4 through C7. (Tr. pp. 159-160). The following day, plaintiff was seen again by Dr. Marcello for complaints of diarrhea and for a checkup. The doctor noted plaintiff's complaints of severe neck pain and pain on range of motion. The assessment included chronic cervical disc pain, generalized anxiety disorder, and hypertension. Plaintiff was prescribed Percocet and Cymbalta and was referred to physical therapy. (Tr. p. 184). On October 12, 2006, plaintiff returned to Dr. Marcello for cold-related symptoms. Plaintiff's neck wound had healed but he was still diagnosed with severe chronic neck pain. Toradol was again administered and plaintiff was prescribed Cymbalta and Elavil. (Tr. p. 185).

Another post-surgical evaluation was performed by Dr. Marcello on January 4, 2007. The assessment on this date included cervical disc disease, hypertension with headaches, and generalized anxiety disorder. Plaintiff was prescribed Percocet and Robaxin and was

15

referred for six weeks of physical therapy. (Tr. p. 186). On January 9, 2007, plaintiff consulted again with Dr. Wong with the presenting problems being identified as hypertensive heart disease and dyslipidemia. The assessment included obstructive sleep apnea, hypertensive heart disease, coronary artery disease, obesity, and ED/prostatitis. Various tests were ordered and plaintiff was instructed to lose weight and was placed on a strict diet. The dosage of Requip was also increased. (Tr. p. 164-168).

On January 12, 2007, plaintiff was seen by Dr. Marcello for a check-up. The assessment included cervical disc disease, hypertension, and a decrease in testosterone. (Tr. p. 187). X-rays of the cervical spine that were taken on January 15, 2007 revealed that the hardware that had been installed at levels C4 through C7 was near anatomic alignment and appeared to be maintained. (Tr. p. 170). Plaintiff was next seen by Dr. Donald Richardson of the TUHC Neurosurgery Clinic on January 22, 2007. Based on the location of the hardware that had been installed on plaintiff's spine he was not felt to be a candidate for placement of a percutaneous epidural spinal electrode in an attempt to control his neck and shoulder pain. That being the case, Dr. Richardson recommended that plaintiff undergo on intrathecal morphine test to determine if that would provide him pain relief. (Tr. p. 144). When plaintiff returned for pre-op clearance on February 5, 2007 he reported

experiencing excellent, almost complete relief with a 0.3 milligram test dose that had been given to him as an outpatient although he was having some mild difficultly in voiding. Plaintiff was thus started on Flomax with surgery to be performed the following day. (Tr. pp. 145, 225).

On February 6, 2007, plaintiff underwent surgical insertion of an intrathecal catheter and Synchromed pump for morphine administration. The procedure was performed with no obvious complications. (Tr. pp. 137-138). Plaintiff's wounds were healing by February 14, 2007 and his voiding problems had resolved with medication. The amount of morphine was doubled to 0.5 milligrams and plaintiff was to return in two weeks for further monitoring. (Tr. p. 222). The dosage of morphine was increased further on February 22, 2007. (Tr. pp. 146, 221).

Plaintiff returned to Dr. Marcello on February 27, 2007 with complaints of a cough, congestion, and urinary frequency. The assessment included chronic prostatitis and hypertension and medications were prescribed. (Tr. p. 188). Another follow-up visit with Dr. Marcello took place on March 1, 2007. (Tr. p. 189). Plaintiff reported that his symptoms had improved when he was next seen by Dr. Richardson on March 7, 2007 but he was still having trouble sleeping as well as feelings of weakness and pain across the shoulders late in the day. The dosage of plaintiff's morphine

pump was increased further and he was referred for active physical therapy as his previous therapy had been passive, i.e., heat, massage, etc. (Tr. p. 220). A further follow-up visit with Dr. Marcello took place on March 28, 2007 and Avodart was prescribed. (Tr. p. 190).

Plaintiff's presenting problems on April 17, 2007 were difficulty staying awake, fatigue with sleepiness, and feeling dazed. Medications included Macrodantin as well as the morphine pump. The diagnosis was chronic back pain and a urinary tract infection. Plaintiff's prescriptions were adjusted as it was felt that he may have been over-medicated. (Tr. p. 191). Plaintiff returned to Dr. Marcello on April 26, 2007 but his treatment note from that date is not a model of legibility. (Tr. p. 192). On June 28, 2007, plaintiff complained of bilateral swelling in the legs, neck stiffness, and bilateral leg numbness. The diagnosis included restless leg syndrome and hypertension. Dermadex, Lasix, and Avandryl were prescribed. (Tr. p. 193).

On June 30, 2007, plaintiff underwent CT scans of the lumbar and cervical spines. Testing of the lumbar spine revealed the hardware at L2 through L5 and findings suggestive of lateral moderate neural foraminal narrowing at L5-S1 with mild neural foraminal narrowing throughout the remainder of the levels. There was also a large posterior osteophyte from the L1 vertebral body

18

questionably causing mild spinal stenosis with MRI or myelogram confirmation suggested. (Tr. p. 195). Similar studies of the cervical spine showed the installed hardware at C4 through C7 with no acute bony or metallic fracture seen. The diagnostic impression was postoperative changes to the cervical spine with anterior fusion. (Tr. p. 196). Plaintiff returned to Dr. Marcello for a check-up on July 26, 2007. Flexeril and Vicodin were prescribed. (Tr. p. 194).

On August 9, 2007, Dr. Edward Dean, an Administration medical consultant, reviewed plaintiff's file and set forth his opinions on a form denominated "Physical Residual Functional Capacity Assessment." There, Dr. Dean indicated that plaintiff could frequently lift and/or carry ten pounds; could stand and/or walk for two hours per eight-hour workday; could sit for a total of six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds but could occasionally perform the other enumerated postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations. (Tr. pp. 197-204).

Plaintiff was seen again by Dr. Wong on September 18, 2007 with the chief complaints being calf pain and swelling, particularly during the evening, and shortness of breath on exertion. The diagnosis included obstructive sleep apnea, restless

leg syndrome, hypertensive heart disease, coronary artery disease, status-post multiple spine surgeries, and prostatitis. (Tr. p. 211). As part of his evaluation Dr. Wong performed a lower extremity venous duplex test which was negative for deep vein thrombosis. (Tr. p. 212). The following day, various tests were run and plaintiff met again with Dr. Wong to obtain the results. An ECG was normal but an EKG was non-diagnostic due to low maximum heart rate. A myocardial perfusion scan was thus performed which produced slightly abnormal results. (Tr. pp. 206-210). When plaintiff returned to Dr. Richardson on November 8, 2007, he reported an increase in pain that was restricting his activities such that he could now only work on a part-time basis. The amount of morphine being administered to plaintiff via the intrathecal pump was increased from 1.25 to 1.5 milligrams per day. (Tr. p. 219).

On December 11, 2007, plaintiff presented himself to Dr. Marcello for a check-up and for labwork. The primary assessment was chronic back pain. (Tr. p. 214). Plaintiff's morphine pump was refilled by Dr. Richardson on January 10, 2008 and the dosage remained unchanged. (Tr. p. 218). On May 6, 2008, plaintiff was seen by Dr. Marcello for complaints of a lump to the left groin area. Toradol was administered. (Tr. p. 244).

Also on May 6, 2008 Dr. Richardson completed a form that had

been supplied to him by plaintiff's attorney denominated "Cervical or Lumbar Spine Residual Functional Capacity Questionnaire." There, Dr. Richardson recalled having treated plaintiff since January of 2007 as well as his diagnosis of post-laminectomy syndrome, cervical. The clinical findings and test results demonstrating plaintiff's impairments were identified as post-op cervical fusion, a motor vehicle accident, and cervical degenerative disc disease shown on MRI. Symptoms were identified as chronic neck and back pain with cervical pain resulting from the fusion. Positive objective signs were significantly reduced range of cervical motion, muscle spasm, and impaired sleep. Dr. Richardson opined that plaintiff needed a job which allowed the ability to alternate at will between sitting, standing, and walking and that he would sometimes need to take unscheduled breaks during a workday. However, an assistive device was not required.

In answer to other questions on the form Dr. Richardson indicated that plaintiff could occasionally lift and carry twenty pounds and could frequently lift and carry ten pounds; that depression secondary to pain was a contributing factor; and, that plaintiff's pain was often severe enough to interfere with attention and concentration. Dr. Richardson noted the implantation of the morphine pump but he was unable to estimate how far plaintiff could walk without needing to rest or experiencing severe

pain nor could he estimate how long plaintiff could continuously sit or stand at a time. The doctor did, however, find that plaintiff could stand/walk for a total of two hours per eight-hour workday and that he could sit for a total of four hours per eight-hour workday. Plaintiff had significant limitations in doing repetitive reaching, handling, and fingering but the doctor gave no estimate of the percentage of time in a given workday that plaintiff was able to engage in such activities. Dr. Richardson further indicated that plaintiff was likely to have "good days" and "bad days" and was likely to be absent from work as a result of his impairments or treatment every two months. In answer to the question of whether plaintiff needed to include periods of walking around during an eight-hour workday and the frequency and duration of such periods, the doctor wrote that with the use of the morphine pump plaintiff could be active. Finally, Dr. Richardson opined that plaintiff was permanently disabled. (Tr. pp. 227-230).

On July 30, 2008, Dr. Marcello wrote prescription refills for Topamax, Darvocet-N 100, Requip, and Cymbalta. (Tr. p. 253). Plaintiff was seen by Dr. Marcello for complaints of congestion and a fever on July 31, 2008. The assessment was acute bacterial sinusitis with fever and medications for that purpose were prescribed. (Tr. p. 248). Another clinic visit for a check-up and medication refills occurred on October 28, 2008 and plaintiff was

administered another injection of Toradol. (Tr. p. 234).

Finally, although the order in which the clinic visits took place is unclear, plaintiff was seen by both Dr. Marcello and Dr. Richardson on November 20, 2008. To Dr. Marcello, plaintiff presented with complaints of pain to his left side around the site of his pain pump. Toradol was again administered. (Tr. p. 232). Plaintiff also made an unscheduled visit to Dr. Richardson at TUHC complaining of tenderness and discomfort over the pump in the left lower abdomen and pain in the left groin and testicle. Dr. Richardson noted a small bruise over plaintiff's pump site which he believed was a soft tissue injury that had occurred while plaintiff was working on his boat. The doctor recommended that plaintiff consult with a urologist for evaluation of possible epididymitis or seminal vasculitis. Plaintiff was to return on December 11, 2008 to have his pump refilled. (Tr. p. 254). As noted earlier, the hearing de novo before the ALJ would subsequently go forward on January 27, 2009. (Tr. pp. 18-40).

Plaintiff challenges the Commissioner's decision to deny Social Security benefits on two grounds. First, he alleges that the ALJ failed to give controlling weight to the opinions of his treating physician. Second, plaintiff argues that the ALJ's opinion is not supported by substantial evidence based on a review of the record as a whole. Finding the second of those challenges to have

merit and to warrant a remand, the Court will pretermit a discussion of plaintiff's first challenge.

Plaintiff alleges that the Commissioner's decision is not supported by substantial evidence as the residual functional capacity assessment that was arrived at by the ALJ is not consistent with the record as a whole. Plaintiff argues that the ALJ wrongfully gave significant weight to Dr. Dean's findings which themselves failed to satisfy the lifting and standing requirements of light work while ignoring the other medical evidence of record in assessing his residual functional capacity.

At the administrative hearing that was held on January 27, 2009, the ALJ asked the VE if plaintiff could perform his past relevant work as a dental lab technician if plaintiff was capable of performing either light <u>or</u> sedentary work.[1] That question was answered in the affirmative. The VE gave this testimony, however, only after testifying that plaintiff's past work was skilled and was performed at the light exertional level. Thus, if plaintiff were truly limited to sedentary work, he could no longer perform his past job. Dr. Dean, the Administration medical consultant

[1] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §404.1567(b). Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §404.1567(a).

whose opinions are presumably of a conservative nature, found that plaintiff's lifting capabilities were consistent only with the performance of sedentary-level work. That being the case, the ALJ should have proceeded to step five of the §404.1520 sequential analysis to determine if there was other work available that plaintiff was capable of performing.[2]/

The Court also has concerns as to whether the ALJ gave proper consideration to the effects of plaintiff's pain and the various medications that he takes for it on his ability to work. Since going under the pain management care of Dr. Richardson, plaintiff has been taking increased dosages of morphine which are administered via an implanted pump. From Dr. Marcello, plaintiff has continued to receive additional pain medications in the form of Vicodin, Darvocet, and Toradol injections on a fairly regular basis. Dr. Richardson opined that plaintiff would often experience pain that was severe enough to interfere with attention and concentration. As noted earlier, the VE testified that plaintiff could not perform his past relevant work if he suffered moderate restrictions in his ability to maintain concentration and attention

---

[2]/ Indeed, depending on whether plaintiff's job skills were transferable to other lines of work, Rules 201.06 and 201.07 of the Medical-Vocational Guidelines, 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1, would dictate different conclusions as to whether plaintiff was or was not disabled.

for extended periods of time and in his ability to complete tasks in a normal workday at a consistent pace. Accordingly, upon remand, the Commissioner is also directed to consider the effects of plaintiff's pain and the medications he takes to control it on his ability to work.

**RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further proceedings consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this ___29th___ day of _____July_____, 2010.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE